```
1  DEAN M. CONWAY
      ConwayD@sec.gov
2  SCOTT W. FRIESTAD
      FriestadS@sec.gov
3  JULIE M. RIEWE
      RieweJ@sec.gov
4  JACOB D. KRAWITZ
      KrawitzJ@sec.gov
5
6  Attorneys for Plaintiff
7  SECURITIES AND EXCHANGE COMMISSION
   100 F Street, N.E.
8  Washington, DC  20549
   Telephone:  (202) 551-4412 (Conway)
9  Facsimile:  (202) 772-9332 (Conway)
```

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SW ARGYLL INVESTMENTS, LLC (d/b/a ARGYLL INVESTMENTS, LLC),<br>JAMES T. MICELI,<br>DOUGLAS A. MCCLAIN, JR.,<br>AMERIFUND CAPITAL FINANCE, LLC,<br>and JEFFREY SPANIER,<br><br>Defendants. | Case No. **'12CV0646 L    WVG**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND OF JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against SW Argyll Investments, LLC (d/b/a Argyll Investments, LLC) ("Argyll"), James T. Miceli ("Miceli"), Douglas A. McClain, Jr. ("McClain"), AmeriFund Capital Finance, LLC ("AmeriFund"), and Jeffrey Spanier ("Spanier"), alleges as follows:

1

## SUMMARY OF THE ACTION

1.   This case involves a fraudulent purported stock-collateralized loan business run by Argyll, which is controlled by Miceli and McClain. Since 2009, Argyll has induced at least nine affiliates of issuers to transfer ownership of millions of shares of publicly traded stock as collateral for purported loans based on a false promise to return the shares to borrowers upon repayments of the loans. Unbeknownst to the borrowers, however, Argyll sold their pledged shares (in unregistered transactions for which no exemption applied) before or soon after funding the loans – and, in many cases, used the proceeds from the collateral sales to fund the loans. Because Argyll agreed to loan 30 to 50 percent less than the market value of the shares transferred, it retained substantial proceeds, even after funding each loan. It also received interest payments. As a result of this scheme, Argyll received more than $8 million in unlawful gains. Argyll attracts potential borrowers, among other ways, through its network of brokers, including AmeriFund, whose president is Spanier.

2.   Through their actions, Argyll, Miceli, and McClain violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and AmeriFund and Spanier violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, made use of the means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the

facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

4. Venue in this District is proper pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants transact business in the Southern District of California, and certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this judicial district.

## DEFENDANTS

5. SW Argyll Investments, LLC (d/b/a Argyll Investments, LLC) is a Texas limited liability company located in San Diego, California, and is affiliated with The Argyll Group. Argyll is jointly owned by James T. Miceli and Douglas A. McClain, Jr.

6. James T. Miceli, age 48, is a resident of Poway, California. Miceli is a member and the Chief Executive Officer of Argyll.

7. Douglas A. McClain, Jr., age 37, is a resident of Savannah, Georgia. McClain is a member and the President of Argyll.

8. AmeriFund Capital Finance, LLC is a Florida limited liability company located in Boca Raton, Florida. Spanier is the sole member of AmeriFund.

9. Jeffrey Spanier, age 46, is a resident of Delray Beach, Florida. Spanier is the President and sole member of AmeriFund.

## RELATED ENTITIES

10. The Argyll Group is a group of Texas and Delaware limited liability companies jointly controlled by Miceli and McClain. SW Argyll Investments, LLC (d/b/a Argyll Investments, LLC) is one of The Argyll Group's companies.

## FACTS

## DEFENDANTS' FRAUDULENT SCHEME, MISREPRESENTATIONS, AND MISLEADING OMISSIONS

A.  **The Stock Based Loan Program**

11. Miceli and McClain control The Argyll Group, a group of Texas and Delaware limited liability companies involved in "Private Equity Investment Banking and Corporate Finance." Argyll, one of The Argyll's Group's companies, provides stock-based lending services.

12. Argyll attracted potential customers through referrals from individuals or entities that hold themselves out as stock loan brokers. Argyll paid these stock loan brokers origination, broker, and "back-end" fees that were based upon the size of the loan transaction.

13. Since 2009, Argyll, directly or through its brokers, made both recourse and non-recourse loans to individuals or entities who pledged as collateral shares (often, restricted shares) of publicly traded stock.

14. AmeriFund and Spanier brokered numerous transactions for Argyll's stock loan program. As part of this brokerage activity, Spanier solicited and negotiated loans that induced the borrowers to pledge shares as collateral for stock sales. From at least 2009, Argyll paid approximately $2 million in fees to AmeriFund and Spanier as compensation for brokering Argyll's stock loans.

15. When a potential borrower contacted Argyll directly or, more often, through a broker like AmeriFund's Spanier, Argyll typically offered to loan 50% to 70% of the market value of the shares that the borrower proposed to use as collateral, depending on factors such as trading market, volume, and price volatility. If the potential borrower accepted the loan proposal, Argyll sent the borrower (or his or her broker) a "Loan Agreement," "Pledge Agreement," "Promissory Note," and other documents, such as instructions on how to transfer the stock collateral to Argyll (collectively, the "Loan Package").

16. Pursuant to the Promissory Note, the borrower agreed to transfer ownership of his or her shares to Argyll. In exchange, Argyll agreed to fund the borrower's loan one to three days after the "Strike Price" (i.e., the collateral's five day Volume Weighted Average Price (VWAP) through the day preceding the closing date) was determined, all documents were executed, and the collateral was delivered to Argyll or its custodial brokerage account.

17. If Argyll funded the loan, the borrower agreed to make quarterly interest-only payments to Argyll, based on a fixed interest rate. The lengths of the loans were generally fixed and were typically three years. Many of the loans also contained a "lockout" provision that prohibited the borrower from prepaying the loan until a specified period elapsed, usually twelve or eighteen months after date of the Loan Agreement.

18. The standard Loan Package did not permit Argyll to sell the collateral except in the event of default. According to the Loan Agreement's section entitled "Lender's Right to Collateral":

> At any time after the date first above written and after Borrower's delivery to Lender of the Collateral, Lender shall be entitled from time to time, in its sole discretion to take any of the following actions with respect to the collateral.
>
> (a) Hold all or a portion of the Collateral as security for the obligations hereunder and under the Note, and pursuant to the Pledge Agreement. . . ; or
> (b) Lend all or a portion of the Collateral, free and clear of any lien or encumbrances . . . ; or
> (c) Pledge, encumber, hypothecate all or a portion of the Collateral free and clear of any lien or encumbrances . . . ; or
> (d) Commingle the Collateral with other assets or securities of the Lender.

19. Moreover, at least one Loan Agreement contained the following additional provision: "Lender <u>shall</u> <u>not</u> <u>sell</u> any of the Collateral unless an Event of Default had occurred and is continuing." (Emphasis added).

20. Miceli and McClain told borrowers orally (and reiterated in the Loan Packages) that Argyll would engage only in "hedging" transactions in connection with the loan to minimize its

5

risk of an increase or decrease in collateral value. Argyll, however, did not enter into any hedging transactions; it simply sold the collateral outright to fund its loans.

21. Upon repayment of the loan, Argyll agreed to return the borrowers' shares within twenty days. If the collateral decreased in value during the life of the loan, the borrower at repayment would receive the fair market value of the collateral originally provided to Argyll (i.e., Argyll would return the initially pledged collateral). If the collateral increased in value during the life of the loan, the borrower would receive the original collateral (minus any hedging costs incurred by Argyll) thereby receiving the benefit of any appreciation in price.

**B.    Argyll's Purported Stock-Collateralized Loan Business is a Fraudulent Scheme**

22. Argyll's purported stock-collateralized loan business is a fraudulent scheme perpetrated by Miceli and McClain to acquire shares of publicly traded stock from borrowers at a 30% to 50% discount to their then-current market value, to sell the shares for full market value in order to fund the loan, and to use the remaining proceeds from the sale of the collateral for their own benefit. Miceli and McClain, through Argyll's Loan Packages and communications with borrowers, made false statements and omitted to state other important facts in connection with this scheme, including lying to borrowers and their representatives about Argyll's selling their collateral prior to any default.

23. Miceli and McClain are joint owners of Argyll. As the sole officers and directors of Argyll, they were the only individuals to sign the Loan Packages on Argyll's behalf. They are also the sole signatories on Argyll's bank and brokerage accounts and control all of Argyll's trading and banking activities.

24. Miceli, McClain, and Argyll did not disclose to borrowers that it intended to sell substantially all of a borrower's shares within days of closing their loans, and, in most cases, explicitly told borrowers that their collateral would not be sold unless a default occurred. In one

instance, McClain specifically told an attorney who negotiated several Argyll stock loan transactions for the borrower that Argyll would not sell the collateral shares.

25. Argyll had no independent source of funds other than the borrowers' collateral and could not lend money without selling the collateral, meaning that, in many cases, Argyll sold the collateral prior to closing the loan, and used the proceeds to fund the loan.

26. In addition, Miceli, McClain, and Argyll misrepresented to borrowers that Argyll would return shares to them upon the borrowers' repayment of the loan. The Loan Agreement stated that Argyll would return "the appropriate number of shares that constitutes the Collateral" to borrowers who repay their loans. Instead, Argyll sold all of the shares that it received from the borrowers, but did not set aside any cash reserves to repurchase and return shares to the borrowers who repaid their loans pursuant to the Loan Agreement.

27. Altogether, Argyll sold virtually all of the pledged collateral, prior to any default. Miceli and McClain used the sales proceeds remaining after funding Argyll's loans to, among other things, pay their personal expenses.

28. Argyll' stock sales accounted for the vast majority of its revenue.

C. **Specific Examples of Defrauded Borrowers**

**Victim A**

29. Victim A is the former Chairman and Chief Executive Officer of a New York Stock Exchange listed-company involved in the development, leasing, and management of real estate ("Company A"). Sometime in 2008 or 2009, Victim A received an unsolicited telephone call from Spanier in which Spanier offered to broker a stock-collateralized loan.

30. In September 2009, Victim A applied for a stock-collateralized loan through Spanier/AmeriFund, who referred him to Argyll. Victim A entered into a three-year loan agreement with Argyll (dated December 1, 2009), in which he pledged 700,000 shares of Company

7

A's stock as collateral. At closing, Victim A's shares had a value of $6,846,000. Argyll agreed to loan Victim A 65% of the stock's value, resulting in a loan of $4,449,900 with an annual interest rate of 4%. McClain executed the loan agreement on behalf of Argyll, which paid Spanier and AmeriFund a $407,337 fee for brokering the loan (representing a 3% origination fee that Argyll subtracted from Victim A's loan proceeds and a 4% "back-end" fee paid by Argyll).

31. On December 3, 2009, Victim A transferred 700,000 shares of Company A to Argyll, which provided Victim A with a $4,316,403 loan (representing the remainder of the $4.4 million loan after Argyll had subtracted AmeriFund's/Spanier's origination fee of $133,497) that same day. In addition to Argyll's standard loan agreement language, Victim A's agreement contained the added provision that the "[l]ender shall not sell any of the Collateral unless an Event of Default has occurred or is continuing." Nonetheless, Argyll sold all of the Company A shares between December 4 and December 10, 2009, generating approximately $6.5 million in proceeds. Argyll profited approximately $1.6 million from the transaction.

32. In October 2010, Victim A sought to repay the loan and retrieve the Company A shares he had pledged as collateral. Victim A provided written notice to Argyll and requested wire transfer instructions to repay the loan on December 1, 2010 – the first day that the Loan Agreement permitted him to prepay. The Loan Agreement required Argyll to return the shares to him no more than twenty days after he repaid the loan. As of December 1, 2010, however, the market price of Company A's stock was $13.08 per share, meaning that Argyll would need to pay approximately $9 million to purchase in the market the Company A shares (which it had sold a year earlier for only $6.5 million) to return to Victim A. Rather than disclosing to Victim A that Argyll had sold his collateral, McClain instead offered to increase Victim A's loan by $1 million, lower the loan's interest rate from 4% to 2.25%, and reduce the prepayment penalty. In exchange, Victim A agreed

to extend the "lockout period" by six months. Victim A accepted this offer and agreed to the new loan provisions; Miceli executed the agreement for Argyll.

33. Neither Miceli nor McClain disclosed to Victim A that Argyll had sold all of his Company A shares in December 2009 within one week of receiving them.

34. On April 20, 2011, Victim A provided Spanier with notice of his intent to repay the loan upon expiration of the second lockout period (June 2, 2011). Spanier forwarded the notice to McClain the following day.

**Victim B**

35. Victim B is the President, Chief Executive Officer, and Chairman of the Board of Directors of an American Stock Exchange-listed company involved in the development, production, and exploration of crude oil and natural gas ("Company B"). On March 30, 2011, Victim B entered into a three-year loan agreement with Argyll (dated March 8, 2011) for which he pledged 1 million shares of Company B. McClain executed the loan agreement – which did not permit Argyll to sell the collateral – on Argyll's behalf.

36. AmeriFund and Spanier brokered Victim B's loan, and Argyll paid AmeriFund/Spanier a total fee of $51,350 in connection with the loan transaction.

37. On April 1, 2011, Victim B transferred 1 million shares of Company B to Argyll. Argyll began selling Victim B's shares, and by the time Argyll funded the $377,000 loan on April 8, 2011, it had already sold almost 400,000 shares for proceeds of approximately $261,000. Argyll sold the remaining shares over the course of the next month and, by May 9, 2011, it had sold all 1 million shares, for total proceeds of approximately $620,000. Argyll profited approximately $192,000 from the transaction.

C. **Defrauded Borrowers of Argyll**

38. The following chart identifies some of the borrowers Argyll defrauded:

| Date of Loan Agreement | Number of Shares Pledged | Loan Amount | Argyll Signatory on Loan Agreement |
|---|---|---|---|
| 12/1/2009 | 700,000 | $4,449,900 | McClain |
| 3/8/2011 | 1,000,000 | $377,000 | McClain |
| 3/3/2010 | 1,000,000 | $4,930,000 | McClain |
| 4/15/2010 | 1,220,000 | $1,537,200 | Miceli |
| 2/12/2011 | 52,246 | $557,726.05 | McClain |
| 12/22/2009 | 3,250 | $46,117.50 | Miceli |
| 10/18/2010 | 750,000 | $307,125 | McClain |
| 11/8/2010 | 800,000 | $236,880 | McClain |
| 1/19/2011 | 750,000 | $207,900 | Miceli |
| 4/16/2010 | 6,000,000 | $1,320,000 | Miceli |
| 9/29/2010 | 6,000,000 | $528,000 | Miceli |
| 2/11/2011 | 490,000 | $735,000 | McClain |
| 3/4/2011 | 490,000 | $764,400 | Miceli |

**ARGYLL'S SALES OF COLLATERAL SHARES WERE NOT REGISTERED WITH THE COMMISSION**

39. The Borrowers identified in Paragraph 38, above, were all affiliates of issuers and pledged restricted shares to Argyll as collateral for their stock loans.

40. Rather than retain the shares as collateral as the Loan Agreements required, Argyll, at the direction of Miceli and McClain, sold the shares into the public markets soon after receiving them.

10

41. These distributions were done without effective registration statements and were not exempt from registration.

## THE DEFENDANTS ACTED AS UNREGISTERED BROKERS OR DEALERS

42. Argyll, along with Miceli and McClain who acted through Argyll, during all relevant times were neither registered as, nor associated with, a registered broker or dealer.

43. Amerifund, along with Spanier who acted through AmeriFund, during all relevant times were neither registered as, nor associated with, a registered broker or dealer.

## FIRST CLAIM FOR RELIEF

**Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5] By Argyll, Miceli, and McClain**

44. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 43, inclusive, as if they were fully set forth herein.

45. By engaging in the conduct described above, Argyll, Miceli, and McClain, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

46. By engaging in the foregoing conduct, Argyll, Miceli, and McClain violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Aiding and Abetting and Control Person Liability for Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5] By Miceli and McClain**

47. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 46, inclusive, as if they were fully set forth herein.

48. By engaging in the conduct described above, Argyll, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

   a. employed devices, schemes, or artifices to defraud;

   b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

   c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

49. Miceli and McClain, knowingly or recklessly, provided substantial assistance to Argyll in connection with its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

50. Miceli and McClain were controlling persons of Argyll for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

51. Miceli and McClain exercised actual power and control over Argyll, including holding joint ownership over Argyll, sole signatory authority on Argyll's bank and brokerage accounts, and authority to execute the Loan Packages.

52. By reason of the foregoing, (a) Miceli and McClain aided and abetted Argyll's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].and (b) as Argyll's controlling persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Miceli and McClain are liable for Argyll's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Violation of Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)] of the Securities Act by Argyll, Miceli, and McClain**

53. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 52, inclusive, as if they were fully set forth herein.

54. By engaging in the conduct described above, Argyll, Miceli, and McClain, directly or indirectly, through the use of the means or instruments of transportation and communication in interstate commerce or the mails, offered to sell or sold securities, or carried such securities through the mail or interstate commerce for the purpose of sale or delivery after sale.

55. No registration statements were filed with the Commission or were in effect with respect to the offer or sale of the securities described above.

56. By engaging in the foregoing conduct, Argyll, Miceli, and McClain violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### FOURTH CLAIM FOR RELIEF

**Violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]
by Argyll, Miceli, McClain, AmeriFund, and Spanier**

57. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 56, inclusive, as if they were fully set forth herein.

58. By engaging in the conduct described above, Argyll, Miceli, McClain, AmeriFund, and Spanier, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being registered as a broker or dealer with the Commission, or being associated with a broker or dealer registered with the Commission.

59. By engaging in the foregoing conduct, Argyll, Miceli, McClain, AmeriFund, and Spanier violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that the Defendants violated the securities laws as alleged herein;

**II.**

Permanently enjoining Argyll, Miceli, and McClain from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], and Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)];

**III.**

Permanently enjoining AmeriFund and Spanier from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

### IV.

Ordering Defendants to disgorge the unlawful profits derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### V.

Ordering Argyll, Miceli, and McClain to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and ordering AmeriFund and Spanier to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

### VI.

Granting such other and further relief as the Court may deem just, equitable, and necessary.

Respectfully submitted,

By: s/ Dean M. Conway
    Dean M. Conway
    Scott W. Friestad
    Julie M. Riewe
    Jacob D. Krawitz

    Attorneys for Plaintiff
    SECURITIES AND EXCHANGE
    COMMISSION
    100 F Street, NE
    Washington, DC  20549
    Telephone:  (202) 551-4412
    Facsimile:  (202) 772-9332
    E-mail: ConwayD@sec.gov

Dated:  March 15, 2012

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Securities and Exchange Commission

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Dean Conway, U.S. Securities and Exchange Commission, 100 F Street, NE Washington DC 20549 (202) 551-4412

## DEFENDANTS
SW Argyll Investments, LLC (d/b/a Argyll Investments, LLC). James T. Miceli, Douglas A. McClain, Jr., AmeriFund Capital

County of Residence of First Listed Defendant  San Diego County, Cal.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)   **'12CV0646 L    WVG**

Unknown

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 330 Federal Employers' Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | [X] 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §§ 78j(b), 77e(a), 77e(c), and 78o(a)
Brief description of cause: violations of federal securities laws

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____    DOCKET NUMBER _____

DATE: 03/15/2012

SIGNATURE OF ATTORNEY OF RECORD: /s Dean Conway

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____